COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS
### CENTRAL DIVISION

| | |
|---|---|
| ALEX M. BALDWIN, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| HOOLIGANS, INC., d/b/a | ) |
| HOOLIGANS, and its agents, | ) |
| servants, representatives and | ) |
| employees; ERIKA KIRBY, | ) |
| individually, and as owner and/or | ) |
| operator of HOOLIGANS; ABC | ) |
| CORPORATION I-V; and JOHN DOE I-V; | ) |
| All Jointly, Severally, and in the | ) |
| Alternative, | ) |
| | ) |
| Defendants. | ) |

---

**AFFIDAVIT OF RICHARD SAFERSTEIN, PH.D. PURSUANT TO G.L.c.231 § 60J**

I, Dr. Richard Saferstein, Ph.D., being first duly placed on oath, do hereby state, depose, and testify as follows:

1.   I am over the age of twenty-one years, a citizen of the United States, and a resident of the State of New Jersey.  I am competent to make this Affidavit, which is based on my personal knowledge and on my education, training, and experience.

2.   I submit this Affidavit pursuant to Massachusetts G.L. c. 231 § 60J in the matter of Baldwin v. Hooligans, Inc., et al., which I am advised will be filed in the United States District Court for the District of Massachusetts.

3.     I understand that I am submitting this Affidavit in connection with and in support of the plaintiff's Complaint against the defendants in which the plaintiff will allege that due to the negligent and/or wanton or reckless service of intoxicating liquor to Lindsey O'Connell and to the plaintiff by employees of Hooligans, Inc., d/b/a "Hooligans", the plaintiff was severely injured in a motor vehicle accident.

### Qualifications

4.     I am a forensic science consultant specializing in forensic aspects of alcohol and drug intoxication.  I received a B.S. in chemistry from City College of New York in 1963, a M.S. in organic chemistry from City College of New York in 1966, and a Ph.D. in organic chemistry from City University of New York in 1970.  From 1970 to 1991 I was the Chief Forensic Scientist for the State of New Jersey, Department of Law and Public Safety, New Jersey State Police. In that capacity, I was the Technical Director of one of the largest forensic science laboratories in the United States, conducting over 35,000 case analyses per year and employing a staff of over 90 professional scientists.

5.     My areas of expertise encompass toxicology, pharmacology and analyses of alcohol and drugs of abuse.  I have been accepted and testified as an expert witness over 2000 times in nearly 150 courts on a variety of forensic science issues which include: breath and blood testing for alcohol content, the pharmacological effects of alcohol, detection and identification of drugs in biological fluids, arson-related analyses, and the forensic examination of blood, semen, hair,

2

paint, fiber, and glass evidence.  My expertise also includes review and evaluation of forensic DNA evidence.

6.    I have held a number of academic positions including Instructor of Forensic Science, Law School of Widener University from 1991 until present.

7.    I maintain a number of professional affiliations including the American Academy of Forensic Sciences, where I was promoted to Fellow in 1977.  I also maintain professional affiliations with the American Chemical Society, Canadian Society of Forensic Scientists, Chromatography Forum of Delaware Valley, International Association for Identification, Mid-Atlantic Association of Forensic Scientists, New Jersey Association for Identification, New York Microscopical Society, Northeastern Association of Forensic Scientists, and Society of Forensic Toxicologists.

8.    In the past, I have held positions as an Analytical Chemist for Shell Chemical Company from 1969 to 1970, and as a Forensic Chemist employed by the U.S. Treasury Department, Alcohol, Tobacco, and Firearms Laboratory in New York from 1964 to 1969.  In the latter capacity, I was responsible for the analysis of drug and alcoholic beverage preparation, and testified on numerous occasions as an expert witness in Federal and State courts on alcohol and drug chemistry.

9.    I have attended and participated in numerous professional educational courses and workshops as detailed in my Curriculum Vitae, including Pharmacology and Pharmokinetics for Forensic Toxicologists, American Academy of Forensic Sciences in 2009, and Effects of Drugs on

Human Performance and Behavior - A Borkenstein Sampler, Society of Forensic Toxicologists in 2008.

10.   I have been awarded numerous honors throughout my professional career, including:  Recipient of the American Academy of Forensic Sciences 2006 Paul L Kirk Award for distinguished service and contributions to the field of Criminalistics; Award of Merit, American Academy of Forensic Sciences, 1995, Rosenblatt Memorial Lecturer in Forensic Science, Northeastern Univ., 1994; Advisory Board member for the Barnett Institute - Northeastern University; Member of the Editorial Board of the Journal of Forensic Identification from 2001 until present; Member of the Editorial Board of the Journal of Forensic Sciences from 1984 to 1994; Member of the Editorial Board of the Microchemical Journal from 1988 to 1995; and Member of the Editorial Board of the Journal of Analytical and Applied Pyrolysis from 1980 to 1984.

11.   I have published numerous books, papers and articles on the subjects of forensic science, criminalistics, chemistry, and the scientific explanation of intoxication.  A complete copy of my current Curriculum Vitae is attached hereto as **EXHIBIT A**.

## Opinions

12.   I was asked to analyze and evaluate materials related to the report and investigation of a motor vehicle accident that occurred on October 20, 2008 in Fitchburg, Massachusetts, in order to render opinions relevant to the case within my areas of expertise.  All of the opinions expressed herein are stated to a reasonable degree of probability and scientific certainty.  The facts expressed in this

affidavit are stated upon information and belief, and are based upon the information provided and rational inferences derived therefrom. The facts and information relied upon are listed below, attached hereto as exhibits, and made a part of this affidavit.

Voluntary Statement of Corey Crocket dated 7/10/09 . . . .  **EXHIBIT B**

Christopher Halscheid's Report dated 5/12/09 . . . . . . . .  **EXHIBIT C**

Voluntary Statement of Lindsey R. O'Connell and Summary of Interview of Lindsey R. O'Connell by Christopher Halscheid  **EXHIBIT D**

Fitchburg EMS Record of Ambulance Service and UMASS Medical Center Medical Records for Alex Baldwin . . . . . . . . .  **EXHIBIT E**

UMASS Medical Center Laboratory Toxicology Report for Alex Baldwin . . . . . . . . . . . . . . . . . . . . . . . .  **EXHIBIT F**

Commonwealth of Massachusetts Motor Vehicle Crash Police Report . . . . . . . . . . . . . . . . . . . . . . . .  **EXHIBIT G**

Narrative and Supplemental Narrative Reports of Officer Antonio F. Pennetti . . . . . . . . . . . . . . . .  **EXHIBIT H**

Supplemental Narrative for Lt. Linda M. Swears . . . . . . .  **EXHIBIT I**

Supplemental Narrative for Officer Stacy Cronin . . . . . .  **EXHIBIT J**

Narrative for Officer Paul M. McNamara . . . . . . . . . .  **EXHIBIT K**

Corey Crocket Witness Statement to Fitchburg Police . . . .  **EXHIBIT L**

Russell Amero Witness Statement to Fitchburg Police . . . .  **EXHIBIT M**

Lindsey O'Connell Witness Statement to Fitchburg Police . .  **EXHIBIT N**

Peter Njuguna Witness Statement to Fitchburg Police . . . .  **EXHIBIT O**

Accident Scene Diagrams/Data by Officer Paul M. McNamara . .  **EXHIBIT P**

Massachusetts Uniform Citation of Lindsey O'Connell and Criminal Complaints against Lindsey R O'Connell and Russell Amero . . . . . . . . . . . . . . . . . . . . . . .  **EXHIBIT Q**

Accident Scene Photographs by Fitchburg Police . . . . . .  **EXHIBIT R**

Fitchburg State College Incident Report and Narrative for Patrol Sarah D. Camelo . . . . . . . . . . .  **EXHIBIT S**

Rights Advisement for Erica Kirby and Sean Daley . . . . . . **EXHIBIT T**

Fitchburg Police Department Record of 911 call . . . . . . . **EXHIBIT U**

Fitchburg Police Department Specific Query Report . . . . . **EXHIBIT V**

Fitchburg Police Department Court Disposition . . . . . . . **EXHIBIT W**

Application for Criminal Complaint . . . . . . . . . . . . **EXHIBIT X**

PCF Adult Record Information for Lindsey O'Connell . . . . . **EXHIBIT Y**

Affidavit of Fred Del Marva, PI, PPO, dated May 19, 2010 . . **EXHIBIT Z**

13.   On October 20, 2008, at approximately 11:51 p.m., Lindsey O'Connell was traveling on Blossom Road in Fitchburg, Massachusetts. At that same time, Alex Baldwin was a pedestrian in the northbound lane of travel.  Mr. Baldwin jumped on the hood of Ms. O'Connell's vehicle, Ms. O'Connell continued to drive a short distance, and then stopped her vehicle causing Mr. Baldwin to slide off of the vehicle and make contact with the roadway.  As a direct and proximate result of this accident, Mr. Baldwin was injured.  Ms. O'Connell stated that she fled the accident scene because she "was afraid" she "would get a DUI."

14.   Ms. O'Connell stated that on the night in question she arrived at Hooligans at approximately 8:15 p.m.  Ms. O'Connell ordered three White Russians.  Ms. O'Connell further stated that she only consumed two of the three drinks and that her boyfriend consumed one of the drinks when she had gotten up to go to the bathroom.  Ms. O'Connell observed that the men were "drinking pitcher after pitcher after pitcher."  Ms. O'Connell did not believe she left the bar intoxicated, indicating that she only had two drinks in three and on

half hours.  Ms. O'Connell testified she left the bar at approximately 11:30 p.m.

15.    According to Christopher Halscheid's Report, Ms. O'Connell remembered arriving at Hooligan's Pub before the start of the New England Patriot's game at 8:15 p.m.  Ms. O'Connell said that Mr. Daley served Mr. Baldwin "six pitchers of beer."  In fact, Ms. O'Connell said "the way those boys drink, and it is in excess, they continually had pitcher after pitcher."  Ms. O'Connell admitted that she consumed two White Russians each from a tall skinny glass approximately six inches in height.  Ms. O'Connell further admitted that she left the scene after the accident in part because she was afraid that she would get a DUI, since she did not know what her limits were, and she did not know how much she was allowed to have to drink before driving.

16.    According to the Narrative of Officer Paul M McNamara, Ms. O'Connell, Mr. Baldwin, Peter Njuguna, Russell Amero and Corey Crockett consumed alcoholic beverages at Hooligans from approximately 8:00 p.m. to approximately 11:30 p.m. on the date of the incident, immediately prior to the incident.  Ms. O'Connell consumed at least two alcoholic beverages prior to operating her vehicle on a public roadway, "diminishing her reasoning ability."

17.    Sean Daley, bartender of Hooligans, stated he served Ms. O'Connell three White Russians during her time at the bar.  Mr. Daley went on to state that the four men in Mr. Baldwin's group shared eight pitchers of beer.  Mr. Daley stated that each pitcher held three beers.  Mr. Daley indicated that no one in the group showed signs of intoxication when he spoke with them and that no one stumbled out the

door.  Mr. Daley further stated that the group arrived at
approximately 8:00 p.m. and left sometime around 11:30 p.m.

18.  According to Ms. O'Connell's Voluntary Statement, she
consumed "two White Russians" from approximately 8:15 p.m. until
approximately 11:30 p.m. at Hooligans.

19.  According to Corey Crockett's Voluntary Statement, Mr.
Crockett observed Ms. O'Connell with two White Russians in a pint
sized glass, and a third White Russian in a much smaller glass.  At
the end of the night Ms. O'Connell offered Mr. Crockett a ride home,
but he turned down her offer because "she appeared to be intoxicated"
to Mr. Crockett.

20.  According to the Affidavit of Fred Del Marva, "the amount
of alcohol served to Ms. O'Connell (in the three White Russians
combined) would have totaled at least 7 1/2 ounces of 80 proof vodka
and 5 to 5 1/2 ounces of Kahlua or other 40 proof coffee liquor."

21.  If it is assumed that an individual of Ms. O'Connell's
weight (approximately 102 lbs.) drank approximately 7.5 ounces of 80
proof alcohol and 5.5 ounces of 40 proof alcohol between about
8:15 p.m. and about 11:30 p.m., and if it is further assumed that she
absorbed alcohol within 60 minutes, and eliminated alcohol at the
average rate of 0.015% per hour, then she would have reached an
approximate blood alcohol level of 0.28% at about 12:30 a.m.

22.  If it is further assumed that Ms. O'Connell was drinking at
a relatively constant rate from approximately 8:15 p.m. until her
departure from Hooligans at approximately 11:30 p.m., and that she
absorbed alcohol within 60 minutes, and eliminated alcohol at the

average rate of 0.015% per hour, then she would have exceeded the blood alcohol concentration of 0.10% after approximately 9:45 p.m. (see attached graph).  Under these circumstances, Ms. O'Connell's blood alcohol concentration would have risen to the level of approximately 0.23% at approximately 11:51 p.m., the time of the accident.

23.   An average individual exhibiting a blood alcohol level at or in excess of 0.10% is to be considered in a visibly impaired state showing clear signs of alcohol intoxication.  It should be noted that Lindsey O'Connell claims not to be a habitual or heavy consumer of alcohol stating, "I don't like drinking because my mom died from a car accident when she had been drinking and some pretty bad things have happened to her from drinking."

24.   From approximately 9:45 p.m., Ms. O'Connell would have exhibited increasing physical manifestations and the unmistakable signs of alcohol intoxication.  Most apparent would have been a significant deterioration in Ms. O'Connell's muscular coordination that would have resulted in poor body coordination and balance.  An unsteady gait, poor balance, slow and uncertain hand movements, and possible slurred speech are commonly the most obvious behavioral changes in intoxicated persons experiencing the blood alcohol levels of Ms. O'Connell.  In this state of intoxication, Ms. O'Connell's condition would have been obvious to individuals who came in contact with her at Hooligans.  A reasonably trained and reasonably perceptive server would have been able to observe Ms. O'Connell's visible state of intoxication.  Under these circumstances, Ms. O'Connell should not

have been served or provided with any alcoholic beverages after approximately 9:45 p.m.  By serving Ms. O'Connell a third White Russian after that time, Sean Daley clearly committed a negligent act when he served alcohol to a visibly intoxicated person.

25.   In this case, observations made by Mr. Crockett of Ms. O'Connell are consistent with the typical signs of alcohol intoxication.  The observations further serve to corroborate the adverse impact that alcohol was having on Ms. O'Connell.

26.   Driving combines a complex array of physical and mental activities, requiring fine motor skills, intelligent decision making, estimates of distance, and rapid and appropriate responses to unexpected hazards, all of which are known to be adversely affected by alcohol.  An individual exhibiting a blood alcohol level of approximately 0.23% is to be considered in a highly impaired state.  At this level of intoxication, a person will normally experience a significant reduction in muscular coordination and may be expected to exhibit poor balance and poor body coordination.  Increased reaction or response times will also be exhibited by such an individual.  Under these circumstances, an individual will experience difficulties with hand-to-eye and foot-to-eye coordination.  These deficiencies will noticeably impact on an individual's ability to respond to a sudden, unexpected occurrence.  A deterioration of judgment and self-control is to be expected with the result being a diminution in one's normal sense of caution and self-restraint.  Such an individual normally exhibits a false sense of self-confidence in one's behavioral pattern.  An individual so influenced becomes a safety risk, taking chances that

would normally be by-passed if she were alcohol-free.  One major study on the relationship between drinking and vehicular accidents clearly shows that drivers with the blood alcohol level experienced by Ms. O'Connell are more than 60 times more likely to become involved in accidents when compared to sober drivers.  Furthermore, a blood alcohol concentration range of approximately 0.23% will adversely affect visual acuity, resulting in a significant loss of depth and distance perceptions.

27.   Based upon the foregoing information and analysis, it is my opinion to a reasonable degree of scientific certainty that Ms. O'Connell was in a highly impaired state at the time of her involvement in an automobile accident in Fitchburg, Massachusetts on October 20, 2008.  This impairment came about as a result of significant alcohol consumption at Hooligans.  In her intoxicated state, Ms. O'Connell's poor sense of judgment allowed her to overestimate her ability to drive a motor vehicle in a careful and trouble-free manner.  The visibly impaired condition of Ms. O'Connell would have been obvious to a reasonably trained and reasonably perceptive observer in her presence at Hooligans after approximately 9:45 p.m. on the evening of the accident.  Ms. O'Connell should not have been served or provided with alcoholic beverages after this time. The continued service and provision of alcohol to Ms. O'Connell after she was visibly intoxicated were the proximate causes leading to the occurrence of her vehicular accident.

28.   Shortly after the accident, Mr. Baldwin was transported to UMASS Medical Center for medical treatment.  There, at approximately

1:37 a.m., a blood sample was drawn from Mr. Baldwin for toxicological analysis.  Subsequent analysis of this sample by the UMASS Medical Center Laboratory showed it to have a serum alcohol concentration of 107mg/dL.  This value is equivalent to a whole blood alcohol concentration of approximately 0.09%.

29.   According to Officer Antonio F. Pennetti's Supplemental Narrative Report, as the paramedics were putting Mr. Baldwin into the ambulance, Mr. Baldwin "began to vomit all over himself and the paramedics."  Mr. Baldwin then "began to thrash around and attempted to pull off his neck collar.  It took a while before the paramedics could subdue and transport Mr. Baldwin.  The Fitchburg E.M.S. Record of Ambulance Service describes Mr. Baldwin's "excessive vomiting" and also indicates that prior to placing Mr. Baldwin in the ambulance, the paramedics started intravenous fluids (IV), normal saline (NS).  While it is not possible to accurately quantify their effects, Mr. Baldwin's vomiting, and dilution of blood with intravenous fluids means that his 0.09% blood alcohol concentration, tested 1 hour and 46 minutes after the time of the accident, likely underreports his degree of intoxication at the time of the accident, and likely underreports the amount of alcohol served to and consumed by Mr. Baldwin.

30.   Russell Amero, a witness, stated that Mr. Baldwin "stood in the middle of the road" and jumped on the hood of Ms. O'Connell's vehicle.  Ms. O'Connell drove for a little while and when Ms. O'Connell slowed down Mr. Baldwin let go and slid off the hood of the vehicle.

31. Peter Njuguna stated that he remembers that at least three pitchers were brought and shots as well. Mr. Njuguna stated that everyone was a little drunk, "buzzed."

32. According to Corey Crockett's Witness Statement, he arrived at Hooligans at approximately 9:15 p.m. to meet with Mr. Baldwin and Mr. Amero. Mr. Crockett estimated that he consumed between 5 and 7 beers and one shot between 9:15 p.m. and sometime just before midnight when he left Hooligans. Mr. Crockett further stated that during that time, Mr. Baldwin, Mr. Amero, and Mr. Njuguna each had as much as he did to drink.

33. According to Corey Crockett's Voluntary Statement, the group "drank several pitchers of beer and also had two rounds of the dollar shot special called "Hot Sex."

34. According to the Summary of Interview of Lindsey R. O'Connell, "Ms. O'Connell remembered that earlier in the evening, Alex had gotten into a loud verbal argument with an unknown man at Hooligans because Alex was wearing a NY Yankee baseball hat, and the man was a Boston Red Sox fan." She said that the incident was not friendly and made her uncomfortable. These observations are consistent with the typical signs of alcohol intoxication and further serve to corroborate the adverse impact that alcohol was having on Mr. Baldwin early in the evening.

35. An individual exhibiting a blood alcohol level of 0.09% is to be considered in an impaired state of alcohol intoxication. At this level of intoxication, a person will normally experience motor impairments such as staggering walk, unsteady balance, and significant

13

deterioration in muscular coordination.  Increased reaction or
response times will also be exhibited by such an individual.  Under
these circumstances, an individual will experience difficulties with
hand-to-eye and foot-to-eye coordination.  These deficiencies will
noticeably impact on an individual's ability to respond to a sudden,
unexpected occurrence.  A significant deterioration of judgment and
self-control is to be expected with the result being a diminution in
one's normal sense of caution and self-restraint.  Such an individual
normally exhibits a false sense of self-confidence in one's behavioral
pattern.  An individual so influenced becomes a safety risk, taking
chances he would normally bypass if he were alcohol-free.
Furthermore, a blood alcohol concentration of 0.09% will also
adversely affect visual acuity, resulting in a significant loss of
depth and distance perceptions.

36.   In this case, observation made by Officer Pennetti and Mr.
Amero of Mr. Baldwin are consistent with the typical signs of alcohol
intoxication.  These observations further serve to corroborate the
adverse impact that alcohol was having on Mr. Baldwin.

37.   Based upon the foregoing information and analysis, it is my
opinion to a reasonable degree of scientific certainty that Mr.
Baldwin was in an impaired state at the time of his involvement in an
automobile accident on October 20, 2008.  This impairment came about
as a result of significant alcohol consumption at Hooligans
immediately prior to the accident.  In his intoxicated state, Mr.
Baldwin's poor sense of judgment and poor motor functions
significantly subjected him to unnecessary risks that ultimately

endangered his health and well-being.  His alcohol-induced state
markedly reduced his capacity to take normal and prudent precautionary
measures that would have avoided the occurrence of this accident.  The
continued service and provision of alcohol to Mr. Baldwin while he was
in a visibly impaired state, as described by the witnesses, was
reckless under the circumstances, and Mr. Baldwin's resulting impaired
state was a proximate cause of the vehicular accident.

    38.   I declare under penalty of perjury under the laws of the
United States of America that the foregoing is true and correct.

    FURTHER AFFIANT SAYETH NAUGHT.


    SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS  11  DAY
OF  June  , 2010.


                              RICHARD SAFERSTEIN, Ph.D.

15



Blood Alcohol Conc. - Wt. % vs. Time   (Lindsey O'Connell)

Time

.00   .05   .10   .15   .20   .25   .30

8:15 PM   9:15 PM   10:15 PM   11:15 PM   12:15 AM   1:15 AM

0.10% @ 9:45 PM

0.23% @ 1:15 PM

0.28% @ 12:30 AM